# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JUANITA BLANCHARD,

        Plaintiff,

   v.                                Case No. 10-CV-338

MICHAEL J. ASTRUE,

        Defendant.

---

## ORDER

On April 20, 2010, plaintiff Juanita Blanchard ("Blanchard") filed a Social Security Complaint (Docket #1) against defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"). After completion of the briefing schedule, the court now reviews the decision of the ALJ as the final decision of the Commissioner.[1] Finding a number of errors, the court will vacate the decision and remand for further proceedings.

## BACKGROUND

### I.    PROCEDURAL BACKGROUND

On August 29, 2006, Blanchard filed for Disability Insurance Benefits under Title II and Supplemental Security Income benefits under Title XVI of the Social Security Act. (Tr. 99-106) (Docket #17-1 to 17-8). After hearing, an Administrative Law Judge ("ALJ") ultimately denied her applications on October 15, 2009. (Tr. 7-

---

[1] The Commissioner also filed a Motion to File Excess Pages (Docket #19) contemporaneous with his brief. Blanchard did not object and the court will grant that motion.

17).  The Appeals Council denied her request for review on February 18, 2010.  (Tr. 1-3).  Blanchard then filed suit in this court.

## II.  FACTUAL BACKGROUND AND HEARING TESTIMONY

Blanchard was forty-eight years old at the time of the hearing.  (Tr. 23).  She graduated from high school and attended college for two years.  (Tr. 23).  Blanchard's past relevant work experience consisted of assembler/labeler, fast food worker, and cashier.  (Tr. 16, 36-37, 128).  At the time of hearing, she lived in her home with her two youngest children, ages twenty-two and seventeen.  (Tr. 34).

### A.  Blanchard's Testimony

At her hearing, Blanchard testified that she had vision problems, as well as back pain that impeded her ability to perform household chores.  (Tr. 26-27).  According to testimony, her back pain forced her to lean on the sink while doing dishes, made it extremely difficult to clean the bathroom, and caused her to require help doing laundry and cooking.  (Tr. 27).  Additionally, leaning for any length of time caused back pain and every ten or twenty minutes she allegedly suffered sharp pains through her back.  (Tr. 29).  She testified that she could only sit for so long before needing to shift positions and stated that she felt she could sit for a maximum thirty minutes before needing to do so.  (Tr. 29-30).  She further testified that she could likely stand for roughly an hour.  (Tr. 30).  Blanchard also stated that her knee would give out on her and that she used a cane to support herself.  (Tr. 30).  Her right knee was particularly worse than the left.  (Tr. 35).  She said she no longer ventured out of her home very often and when she did, for example to the grocery

store, she would only do so if someone was with her. (Tr. 30). According to Blanchard, she could no longer lift anything heavy, stating that even a gallon of milk might be too much. (Tr. 31). She noted that she needs to catch her breath after walking between rooms at home, and that her medications cause dizziness and shaking in her hands. (Tr. 34).

Blanchard also testified that she had been in trouble with Wisconsin Works ("W-2") for not reporting work she performed. (Tr. 32). As a result, she was then in the process of paying W-2 back. (Tr. 32). Blanchard also gave testimony regarding her mental health. She testified that she received treatment briefly for depression and anxiety, but did not continue with the therapist. (Tr. 33-34). She stated that she spoke to her sister often, despite the fact that her sister was deceased. (Tr. 34, 216).

### B. Vocational Expert Testimony

At the hearing, Mr. Newman, a vocational expert ("VE"), testified regarding the ability of a hypothetical individual to perform work. (Tr. 35-39). The ALJ described a hypothetic individual with Blanchard's age, education and work experience: able to occasionally lift up to twenty pounds and frequently ten pounds; no ability to climb ladders, ropes, or scaffolds; ability to occasionally climb ramps or stairs, and occasionally stoop, crouch, kneel, and crawl. (Tr. 37). Further, the hypothetical person must avoid concentrated exposure to irritants, and any work must be limited to simple, routine, repetitive tasks. (Tr. 37). Based upon that hypothetical, the VE opined the person would be able to perform fast food work. The ALJ then presented

a new hypothetical person of the same age, education and work experience as Blanchard: able to work at the sedentary level; must avoid concentrated irritants; and is limited to simple, routine, and repetitive tasks. (Tr. 37-38). The VE testified that the hypothetical person would be capable of performing Blanchard's past assembler/labeler job, assuming it was substantial gainful activity. (Tr. 38). The VE also testified that the hypothetical person would be able to perform work as a surveillance monitor, information clerk, or interviewer. (Tr. 38).

After that response, the ALJ added to the hypothetical that the work must be low-stress, as in only occasional decision-making, only occasional changes in work setting, no interaction with the public, only occasional interaction with coworkers, and no tandem tasks. (Tr. 38). The VE responded that the hypothetical person would be able to perform the past assembler/labeler work, as well as production inspector, office clerk, or surveillance monitor. (Tr. 38-39). The ALJ then further limited the hypothetical by stating that the person must have a sit/stand option at work which provided for the ability to sit or stand alternatively at will, provided the person was not off-task for more than 10% of the work period. (Tr. 39). The VE testified that would not alter his opinion of available work. (Tr. 39). However, the VE stated that if the sit/stand option allowed for 25% of the time spent off-task, that would eliminate all jobs previously stated. (Tr. 39).

## III.     MEDICAL EVIDENCE OF RECORD

### A.     Physical Impairments

Blanchard began treatment with Dr. Sethi in June 2004. (Tr. 200). After examination on her first visit, Dr. Sethi diagnosed massive morbid obesity, severe essential hypertension, severe case of noncompliance, major depressive neurosis, and chronic low back pain syndrome. (Tr. 201). Blanchard saw Dr. Sethi again in March 2005 for medication refills, during which Dr. Sethi noted continued morbid obesity, severe essential hypertension, major depressive neurosis, and chronic low back pain syndrome, as well as the addition of iron deficiency anemia and left ventricular hypertrophy. (Tr. 197). Blanchard followed up with Dr. Sethi a couple weeks later following some tests. (Tr. 192). Blanchard next saw Dr. Sethi in August 2006. (Tr. 187-88). While Blanchard told Dr. Sethi that she was "basically" in good health, Dr. Sethi nonetheless diagnosed her with exogenous centripetal obesity and borderline hypertension. (Tr. 187-88). The next day, Dr. Sethi further indicated the existence of essential hypertension, chronic low back pain, lumbosacral radiculopathy, and major depressive neurosis. (Tr. 189). Dr. Sethi again noted essential hypertension and chronic low back pain on August 25 and 28, 2006, as well as major depressive neurosis on August 25, 2006, and anxiety neurosis on August 28, 2006. (Tr. 185, 183). Dr. Sethi saw Blanchard again in September and October 2006 for a respiratory infection. (Tr. 181, 177). On both occasions, he noted essential hypertension and anxiety neurosis. (Tr. 181, 177). In September, he also noted chronic low back pain. (Tr. 181).

In March 2007, Dr. Davidoff evaluated Blanchard for the Disability Determination Bureau, noting no reaction to pinprick on her right upper extremities and no sensory reaction on the right side lower extremities. (Tr. 224). Otherwise, her range of motion was full and strength good to good plus in her upper extremities; lower extremities were otherwise generally unremarkable. (Tr. 224). X-rays indicated evidence of mild bilateral degenerative disc disease in her right knee and mild degenerative disc disease of the lumbar spine. (Tr. 226-27). Dr. Davidoff diagnosed Blanchard with a history of hypertension, obesity, low back pain, right leg numbness and knee pain, and a history of depression. (Tr. 224-25).

Blanchard was seen on March 15, 2007, by a state agency reviewing physician, Dr. Mina Khorshidi. (Tr. 228-35). Dr. Khorshidi noted an ability to occasionally lift twenty pounds, frequently ten, stand or walk about six hours in an eight-hour workday, sit about six hours, and unlimited push and pull. (Tr. 220). On July 24, 2007, Dr. Pat Chan came to the same conclusions. (Tr. 262-68).

Blanchard saw Dr. Sethi again in June 2008. (Tr. 314-17). She presented for a checkup and Dr. Sethi made the following assessments: coronary artery disease, chest pain, essential hypertension asthma, chronic obstructive pulmonary disease, esophageal reflux, hyperactivity of the bladder, female stress incontinence, menorrhagia, menopausal disorder, vulvovaginitis, lumbago, tension-type headache, fibromyalgia, depression, anxiety disorder, and leiomyoma of the uterus. (Tr. 317).

Dr. Sethi also completed both a Lumbosacral Spine Impairment Medical Assessment Form and a Physical Residual Functional Capacity ("RFC")

Questionnaire. (Tr. 291-301). According to Dr. Sethi, Blanchard experienced severe, constant pain in the lower back precipitated by movement. (Tr. 292, 298). He also noted significant limitation of motion in her lumbar spine. (Tr. 299). In his opinion, Blanchard could lift or carry twenty pounds rarely, ten occasionally, and less than ten frequently. (Tr. 294, 301). He also believed Blanchard could: sit for only about two hours total in an eight-hour workday; could stand for about two hours total; would need a cane for occasional standing or walking; and would require a job that permitted shifting positions from sitting, standing, or walking at will and would allow four unscheduled twenty-minute breaks per day, or five for fifteen minutes. (Tr. 294, 300). Dr. Sethi indicated that Blanchard would require the ability to walk around every thirty minutes for ten minutes at a time, and that she could stand for only fifteen minutes at a time. (Tr. 294, 300). He also indicated she could never twist, stoop, crouch, squat, or climb ladders and could only rarely climb stairs. (Tr. 295). Blanchard's pain, he noted, would frequently interfere with the attention and concentration needed for even simple work tasks. (Tr. 293). He also noted she was not capable of tolerating even "low stress" jobs. (Tr. 293). According to Dr. Sethi, Blanchard would be unable to perform or be exposed to public contact, routine repetitive tasks at consistent pace, detailed or complicated tasks, strict deadlines, close interaction with coworkers/supervisors, fast paced tasks, or exposure to work hazards. (Tr. 299). He evaluated Blanchard as being able to use her hands, arms, and fingers for 100% of the eight-hour workday. (Tr. 295, 301). He also noted she

would miss roughly four days of work a month because of her impairments. (Tr. 295, 301). He also noted that he did not believe Blanchard was a malingerer. (Tr. 293).

In August 2008, Dr. Sethi completed a subsequent Physical RFC Questionnaire. (Tr. 303-06). That RFC finding stated similar functional restrictions, though Dr. Sethi additionally indicated that Blanchard could use her right hands and fingers only 50% of the time during a workday. (Tr. 306). Then, in February 2009, Blanchard visited Dr. Sethi again, presenting with complaints of rapid weight loss, weakness, and palpitations. (Tr. 308). Blanchard reported right and left hand soft tissue swelling to Dr. Sethi. (Tr. 308). Dr. Sethi noted that her gait and stance, balance, motor function, and sensation were all normal. (Tr. 311). Dr. Sethi assessed: abnormal electrocardiogram, sinus tachycardia, coronary artery disease, chest pain, unspecified hypertensive heart disease without congestive heart failure, essential hypertension, asthma, chronic obstructive pulmonary disease, emphysematous chronic bronchitis, esophageal reflux, hyperactivity of the bladder, female stress incontinence, menorrhagia, menopausal disorder, hypokalemia, thyrotoxicosis with or without goiter, lumbago, lumbar disc degeneration, tension-type headache, fibromyalgia, depression, anxiety disorder, and iron deficiency. (Tr. 312).

## B.    Mental Impairments

On February 26, 2007, psychologist Dr. Lula Reams conducted a psychological examination. (Tr. 214-18). Based on her examination, Dr. Reams

assigned a Global Assessment of Functioning ("GAF") score of 50-55.  (Tr. 218).[2]

She also diagnosed Blanchard with major depressive disorder.  (Tr. 218).  She

opined that, regarding capacity for work, Blanchard was:  slightly impaired as to her

ability to understand, remember, and carry out instructions; slightly impaired in her

ability to sustain concentration persistence and pace; moderately to markedly

impaired in her ability to relate to supervisors and coworkers; and moderately

impaired in her ability to cope with routine work stress and adapt to changes.  (Tr.

218).

A month later, in March 2007, psychologist Dr. Eric Edelman submitted a

review indicating his belief that Blanchard's impairments were not severe.  (Tr. 236).

He found no limitation regarding activities of daily living, maintaining social

functioning, maintaining concentration, persistence, or pace, nor did he find episodes

of decompensation.  (Tr. 246).

On June 14, 2007, Eric Bagley, a UMOS employee, completed a Professional

Contact Questionnaire for W-2, noting the attentiveness and competence of

Blanchard as well as no noticeable unusual or inappropriate mannerisms or thinking.

(Tr. 258).  Mr. Bagley based his opinion on monthly visits from Blanchard between

November 2006 and May 2007.  (Tr. 258).  When asked about other information or

---

[2]The Global Assessment of Functioning is a scale for reporting a clinician's judgment of an individual's overall level of functioning.  A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupation, or school functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision 2000).  A score of 41-50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  *Id.*

comments he felt were pertinent, he offered his opinion that Blanchard has the ability to work, though "duties may be limited." (Tr. 260).

On July 31, 2007, Dr. Roger Rattan, a state agency psychologist, submitted a review indicating depressive syndrome characterized by appetite disturbance with change in weight, sleep disturbance, and decreased energy. (Tr. 272). He found Blanchard mildly restricted in daily living activities and moderately restricted in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 279). In completing a mental RFC assessment, he noted moderate limitations in Blanchard's ability to maintain attention and concentration for extended periods, and in her ability to work in coordination with or proximity to others without being distracted. (Tr. 283). He also found moderate limitations regarding her ability to accept instructions and respond appropriately to criticism from supervisors, and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 284). He found no significant limitation in her ability to interact with the general public. (Tr. 284).

Finally, Blanchard engaged in psychological counseling beginning in November 2008 and lasting through April 2009. (Tr. 319-31). During her first session in November, Blanchard reported: at age 9 finding her older sister dead in bed; being sexually assaulted at age 15 by knife point; and two suicide attempts at age 17. (Tr. 327-30). After failing to attend her next two sessions, Blanchard's file was closed in January 2009. She then attended a session in February 2009, during which the therapist ascribed a GAF score of 45 to Blanchard, with a high of 50 for

the past year. (Tr. 322-23). The therapist also diagnosed her with post-traumatic stress disorder at that time. (Tr. 322). Blanchard then failed to attend a further appointment and did not call to schedule another after receiving a phone call from the therapist. (Tr. 320-21). Blanchard's file was subsequently closed. (Tr. 319).

## ANALYSIS

Blanchard alleges four overarching errors in the Commissioner's denial of her application for benefits. The ALJ: improperly disregarded her treating physician's medical opinion; conducted a flawed RFC assessment; failed to properly support his credibility finding with regard to Blanchard's allegations; and failed to meet his burden at step five of the sequential evaluation process because of faulty hypotheticals. The court agrees that the ALJ made a number of errors, and will thus vacate and remand the decision.

This court reviews the decision of the ALJ to determine whether it is supported by substantial evidence or results from an error of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004). Evidence is sufficient where a reasonable person would conclude the evidence supports the decision. *Id.* at 369. However, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). As such, the ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Id.* For example, where one ALJ referred to no evidence other than two reports, and those reports

alone did not provide a rational basis for the conclusion, the decision could not be upheld. *Id.* A decision should not necessarily be upheld on the basis of post hoc arguments made by the government, but never offered by the ALJ. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

## I.    WEIGHT GIVEN TO TREATING SOURCE OPINION

Because many other errors Blanchard complains of can be traced in some form to the ALJ's discounting of the opinion of Dr. Sethi, the court deals with that issue first. In sum, the ALJ provided only conclusory reasons for giving "very little weight" to Dr. Sethi's assessments, failing to establish an accurate and logical bridge between the evidence and the conclusion. Generally, a treating source opinion is due more weight than other opinions. 20 C.F.R. § 404.1527(d)(2). In fact, where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it is due controlling weight. *Id.* Thus, controlling weight depends on: (1) being well-supported; and (2) consistency with the other substantial evidence. Social Security Ruling [hereinafter SSR] 96-2p.[3] However, a finding that an opinion is not due controlling weight does not mean it should be rejected, but rather is still entitled to deference and its weight determined using a collection of factors. *Id.* Where controlling weight is not proper, the appropriate weight is determined by looking to the length of treatment and frequency of examination, the nature and extent of

_____

[3]Social Security Rulings are binding on all components of the agency. 20 C.F.R. § 402.35(b)(1).

treatment, evidence provided to support the opinion as well as the quality of explanation, consistency of the opinion with the record as a whole, and other factors. 20 C.F.R. § 404.1527(d)(2)-(6). An ALJ is required to give "good reasons" for the weight accorded to a treating source opinion. *Id.* § 404.1527(d)(2). That is, the ALJ's decision must "contain specific reasons . . ., supported by the evidence . . ., and must be sufficiently specific to make clear to any subsequent reviewers the weight . . . and the reasons for that weight." SSR 96-2p.

Here, the ALJ wrote that he gave "very little weight" to Dr. Sethi's assessments. (Tr. 15). In what the court assumes is the reasoning for this conclusion, the ALJ noted:

> Although the claimant has been seen since about 2000, she testified she was only seen twice a year unless [s]he was having problems. Dr. Sethi's assessments are a bit inconsistent with each other and not supported by the evidence of record. The assessments are mostly reflective of sedentary functional capacity with the exception of how long the claimant could sit during an eight-hour workday and how many days of work per month she would likely miss. The undersigned finds no support for the assertion the claimant would miss 4 or more days per month. Further, the undersigned finds for why [sic] the claimant could not sit at least 6 hours per day in a sedentary job. She stated at the hearing she could sit for 30 minutes before she needed to shift positions, but did not know how long she could sit in a day. She stated she could stand for "a good hour" before her knee started hurting. These assertions are simply not supported by the evidence of record.

(Tr. 15). This is not sufficient reasoning. In stating that the assessments are inconsistent with each other, the ALJ offers no examples or further reasoning, but rather relies on what is essentially boilerplate language taken from the regulations. Though the Commissioner attempts to provide examples of inconsistency in his

brief, the ALJ did not do so in the decision. There is nothing to review here: no bridge between evidence and conclusion; no good reasons; no specific reasons; and no supporting evidence. In fact, the ALJ's decision states that Dr. Sethi's assessments are inconsistent with *each other*, not that they are inconsistent with other substantial evidence in the record. To the extent the ALJ considered some of Dr. Sethi's assessments to be substantial evidence that other assessments were inconsistent with, he does not explain which ones are inconsistent with which others. And in any event, even interpreting the ALJ's conclusion on consistency more liberally, he still failed to otherwise explain how or why the assessments conflicted with other substantial evidence in the record.

Neither did the ALJ sufficiently articulate reasons that Dr. Sethi's assessments were not well-supported. Regarding Dr. Sethi's finding of four or more days missed per month, the ALJ simply states that he "finds no support." While it may be more difficult to document the *absence* of something, it surely requires more than a conclusory statement. A "well-supported" opinion does not mean the opinion must be fully supported, and it requires a judgment based on "an understanding of the clinical signs and laboratory findings in the case record and what they signify." SSR 96-2p. The ALJ failed to provide any reasons for this court to review.

As to the six hours of sitting, the ALJ based his finding of a lack of support on the fact that Blanchard stated she could sit for thirty minutes, but did not know how long during a day, then stated that the assertion was not supported. First, a disbelief of Blanchard's statement does not itself show Dr. Sethi's assessment to be

unsupported. Upon reviewing the record, there appear to be possible explanations for Dr. Sethi's finding. These explanations may not be sufficient, but none were addressed by the ALJ. In sum, he failed to build an accurate and logical bridge between the evidence and his conclusion that Dr. Sethi's opinion did not deserve controlling weight.

What's more, even aside from the fact that the ALJ gave insufficient reasons for why the opinion did not deserve controlling weight, he also failed to explain the reasons for giving it the weight he did. He begins by acknowledging that Dr. Sethi had treated Blanchard for roughly nine years,[4] but then discounts that fact by noting that she was only seen twice a year unless having problems. This information certainly goes to the length and frequency of examination factor, but there is not much analysis attached. As the regulations state, "[w]hen a treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the] impairment," more weight will be given to the opinion. 20 C.F.R. § 404.1527(d)(2)(I). The ALJ did not discuss why twice-yearly visits negated the overall familiarity with Blanchard's condition developed over a five-year period. Neither did the ALJ discuss anything to do with why twice-yearly visits would or should reduce the weight of the treating source opinion regarding a person who, on the record, appears to be otherwise generally noncompliant, unwilling to leave the home, and dislikes contact with other people. (*See e.g.*, Tr. 193, 201, 214, 216,

---

[4]Though the ALJ refers to Blanchard's treatment as beginning in 2000, she only started seeing Dr. Sethi in 2004. This clouds the question of whether the ALJ was familiar with the record.

319-30). Maybe there is a good reason, but the ALJ did not lay one out. The ALJ also did not discuss anything regarding the nature and extent of treatment provided by Dr. Sethi, nor, as discussed above, did the ALJ give sufficient reasons for the supposed inconsistency and lack of support for the opinion.

This is all particularly troublesome in that the ALJ discusses only those findings in conflict with his RFC assessment. While an ALJ may choose to adopt only parts of an opinion, *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007), it becomes less clear how or why the ALJ afforded "very little weight" to the opinion where it generally agreed with the ALJ's RFC assessment except in a couple critical areas. Did the ALJ also afford very little weight to those assessments in line with his own? If so, why are those assessments otherwise accepted? If not, why are those portions of Dr. Sethi's opinion that disagree with the ALJ's assessment afforded such little weight in the face of the apparent accuracy of the rest of the opinion? None of this is ever explained. In total, the ALJ failed to rationally articulate reasons for rejecting Dr. Sethi's assessments and, as such, committed error requiring remand.

## II. RESIDUAL FUNCTIONAL CAPACITY FINDING

The next point of dispute is the sufficiency of the ALJ's RFC assessment. An RFC finding represents the maximum that a claimant is still capable of despite her mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). Blanchard argues that the ALJ failed to explain whose opinion supported his RFC finding, failed to address certain limitations discussed by Dr. Sethi, failed to consider Blanchard's need to use a cane

to walk or stand, failed to adequately consider Blanchard's obesity, did not specify the frequency of a sit/stand option for sedentary work, and did not properly consider Blanchard's mental limitations. Blanchard is correct regarding the majority of these complaints, further necessitating a remand of the decision.

An RFC assessment must describe how evidence supports each conclusion, citing specific medical and non-medical facts. SSR 96-8p at 7. In discussing the RFC assessment, an ALJ must, *inter alia*, "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* Further, the assessment must always consider and address medical source opinions. *Id.* An ALJ is not required to rely entirely on a particular opinion or choose between opinions of the claimant's physicians. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). However, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* Thus, an ALJ may not substitute his own judgment for that of a physician's without relying on other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

## A.    Ability to Sit and Supporting Opinions

Blanchard's first argument, that the ALJ failed to explain whose opinion supported the RFC, is on point, specifically with regard to her supposed ability to sit for six hours during a workday. In order to perform a full range of sedentary work, a claimant must be able to sit for at least six hours of an eight-hour workday. SSR 96-9p. The ALJ here found Blanchard generally capable of sedentary work, with

exceptions not relevant to the overall length of time spent sitting. (Tr. 14). When he discussed the length of time Blanchard could be expected to sit, he found:

> [no reason] for why the claimant could not sit at least 6 hours per day in a sedentary job. She stated at the hearing she could sit for 30 minutes before she needed to shift positions, but did not know how long she could sit in a day. She stated she could stand for "a good hour" before her knee started hurting. These assertions are simply not supported by the evidence of record.

(Tr. 15). That is the extent of the discussion, in spite of the fact that Dr. Sethi's RFC assessment concluded Blanchard could sit no more than two hours in an eight-hour workday. As discussed above, the ALJ failed to sufficiently explain why Dr. Sethi's opinion was given the weight it was. Though the ALJ recited some findings of the other physicians that performed physical examinations (Tr. 12-13), he did not discuss any aspects that would contradict Dr. Sethi's finding. The Commissioner argues that the opinions other than Dr. Sethi's do, in fact, support the ALJ's RFC finding because they found Blanchard capable of light work. However, the ALJ never referred to those opinions' findings regarding Blanchard's ability to sit for at least six hours, let alone analyzed them in comparison to Dr. Sethi's finding. In fact, the conclusion after Dr. Davidoff's exam was light RFC, but that because of Blanchard's height, weight, and ongoing pain, her RFC would need to be reduced. (Tr. 252). The ALJ never otherwise explained (or even mentioned) the inconsistencies in the ability-to-sit findings, nor relied on any other evidence in the record in place of Dr. Sethi's.

The Commissioner also argues that the ALJ's assessment is supported because Blanchard never complained of an inability to sit for six hours when presenting to Dr. Sethi, that Dr. Sethi's notes contained no objective clinical findings to suggest a limited ability to sit, and that examinations show normal gait and station, motor function, and sensation. However, even if these constituted reasonable justification, the ALJ did not draw these connections, rather they are the product of post hoc argument by the Commissioner. In this case, those reasons are not so clearly sufficient that the court can say, had the ALJ offered such, they would be upheld. None of those facts are necessarily contradictory to an inability to sit for six hours a day.[5]

Additionally, the Commissioner argues that the ALJ noted Blanchard had not received consistent treatment and that her ability to perform her daily activities lent support to the ALJ's finding. The ALJ himself never pointed to a lack of frequent treatment, or an ability to perform daily living activities, as a reason for why Blanchard could sit for six hours at a time. At most, he offered them as support for finding Blanchard not credible, and for discounting Dr. Sethi's opinion. Thus, these arguments have been dealt with to some degree above, and are otherwise more properly dealt with in reviewing the ALJ's credibility determination, discussed below.

_____

[5]Requiring a patient to complain of an inability to sit for six hours seems oddly specific, and in other cases might even be argued by the government as suspicious. Normal gait and station, motor function, and sensation say little about ability to remain seated. And to the extent there are no "objective" findings to support an inability to sit for six hours, the court is not sure how accurate that is given the repeated diagnosis of chronic lower back pain.

In essence, the ALJ offers no evidence to *support* Blanchard's ability to sit for six hours a day, thus he has failed to build any bridge between evidence and conclusion, let alone an accurate and logical one. None of the potential reasons offered by the government that the ALJ *might* have secretly relied on, without disclosing them, are so evidently correct that the court can overlook the lack of articulated reasons. This is particularly true in light of the ALJ's inadequate discounting of Dr. Sethi's opinion. Thus, the court finds that the ALJ failed to build an accurate and logical bridge between the evidence and his conclusion that Blanchard was capable of sitting at least six hours a day and, therefore, capable of sedentary work.

### B. Blanchard's Ability to Use Her Right Arm and Hand

Blanchard also argues the RFC assessment was flawed because the ALJ failed to address Dr. Sethi's opinion that Blanchard could only use her right hand and fingers for 50% of the workday. In light of the inadequacy of the ALJ's rejection of Dr. Sethi's opinion, the failure to address this issue further infects the RFC assessment. Significant reaching or handling limitations can eliminate large numbers of occupations. SSR 85-15. Accordingly, failing to address that in an RFC assessment, where there is evidence of limitation, results in an improper assessment. Though it is entirely possible an ALJ could find Dr. Sethi's assessment on this issue deserving of no weight, the ALJ did not properly address Dr. Sethi's opinion, as discussed above. The Commissioner's arguments as to lack of evidentiary support are particularly unavailing where the government merely points

to denials of physical complaints during presentation to Dr. Sethi and a failure to allege the limitation at the hearing. Here, even independent consultative exams found lack of sensation on Blanchard's right side, yet that evidence was not discussed, presumably because of the general, and improper, disregard for Dr. Sethi's opinion. As such, failing to address Dr. Sethi's finding of reduced ability to grasp and manipulate failed to build an accurate and logical bridge between the evidence and the RFC finding.

The Commissioner argues that an ALJ is not required to cull through medical records to discuss every potential ailment ever suffered, but that instead there is a presumption that a claimant represented by counsel has made her best case before the ALJ. *See Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *Getch v. Astrue*, 539 F.3d 473, 480-81 (7th Cir. 2008). Both of those propositions may be independently true, but to the extent the Commissioner joins them to propose that a claimant must re-allege at hearing every piece of evidence already submitted into the record in order for it to be considered, that cannot be the case. This evidence was readily apparent in Dr. Sethi's opinion, and seemingly further corroborated in other opinions. Though the final case a claimant presents to an ALJ may not include small details hidden in or absent from the record, but not alleged at hearing, it seems harder to believe that details readily apparent on the face of the only treating source's opinion, submitted into the record by the claimant, is somehow outside of her case presented. As such, the ALJ's failure to analyze Blanchard's alleged

limitations of her right hand and fingers led to an RFC assessment lacking an accurate and logical bridge between evidence and conclusion.

### C. Blanchard's Need for a Cane

Blanchard also faults the ALJ for failing to consider her alleged need to use a cane to walk or stand. This complaint is less persuasive. Though the ALJ did not mention Blanchard's assertion, neither does Blanchard explain what about the RFC might have changed. However, by the same token, Dr. Sethi did note in his RFC that Blanchard required a cane to assist in any occasional standing or walking and Blanchard likewise raised the issue at her hearing (Tr. 30). Thus, to the extent the ALJ did not discuss this limitation because of an overall improper discounting of Dr. Sethi's opinion, it should at least be considered upon remand.

### D. Blanchard's Obesity

Blanchard further complains that the ALJ failed to adequately consider her obesity. The ALJ made little direct analysis of obesity other than two mentions, one a recital of evidence, and the other a conclusion simply that Blanchard so suffered. However, the court is persuaded by the Commissioner's argument that, even if the ALJ should have provided further analysis, such failure would be harmless error.

The Seventh Circuit has noted that a failure to explicitly consider obesity can be harmless error where the ALJ specifically predicates his decision upon the opinions of physicians who discussed the claimant's weight. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). Where the ALJ relied on such opinions, and the claimant made no further argument that obesity exacerbated her impairments,

the error is harmless. *Id.* at 737. The case is sufficiently analogous here. Though the court finds that the ALJ did a poor job explaining exactly which medical opinions he relied on, or why, the fact is that all of the available medical opinions recognized and discussed Blanchard's obesity and she did not make any additional claims at hearing. Even Dr. Sethi's opinion, while coming to a different outcome in his RFC assessment, did not indicate any further aggravations resulting from obesity. Thus, any error would be harmless here.

### E. Frequency of the RFC's Sit/Stand Option

Blanchard's next complaint is that the ALJ failed to assign a specific frequency to the sit/stand option he listed in his RFC assessment. She asserts that frequency is a crucial component of the option. However, the Commissioner is correct that, at hearing, the ALJ specifically instructed the VE that the sit/stand option was to be "at will," provided the hypothetical person was not off-task more than 10% of the work period. (Tr. 39). The ability to sit or stand at will with a limit to being off-task in fact provides an outer range of frequency. Blanchard asserts that this is a post hoc rationalization, but the description of frequency is straight from the mouth of the ALJ, not buried in a medical report that the Commissioner now points to without it ever having been cited by the ALJ. Thus, the ALJ did not err in regard to the sit/stand option.

However, because the ALJ discounted Dr. Sethi's opinion, he did not discuss the doctor's finding that Blanchard would require four or five unscheduled breaks per workday. Though Dr. Sethi's two assessments vary slightly, even the shorter length

-23-

of time required on break (seventy-five minutes) would amount to roughly 15.6% of a workday. Thus, depending on the ALJ's treatment of Dr. Sethi's opinion on remand, he may need to consider a minimum 15% of time spent off-task in the sit/stand option on remand.

### F. ALJ's Mental RFC Assessment

Last, Blanchard takes issue with the ALJ's consideration of her mental impairments in constructing his RFC assessment. There are a number of unexplained inconsistencies in the ALJ's opinion that in aggregate show a failure to sufficiently support the RFC assessment with reasons related to Blanchard's mental limitations. At step three of the sequential evaluation process, an ALJ must determine whether any impairments (or combination) meet or equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, otherwise known as the "listings." 20 C.F.R. § 404.1520(a)(4)(iii). In evaluating whether a listing is met, the ALJ should consider the following criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 40 C.F.R. pt. 404, subpt. P, app. 1, at 12.00. However, even if a listing is not met, any impairments must still be considered in assessing the claimant's RFC. SSR 85-16.

To begin, the ALJ found that Blanchard was only mildly limited in her daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 14). The ALJ noted that Dr. Rattan found moderate limitations in Blanchard's social functioning and concentration/persistence/pace, but

discounted those opinions. (Tr. 14). He based this finding on the fact that "the bulk of the evidence, including the consultative examination [of Dr. Reams] demonstrate the claimant has only mild[] limitations." (Tr. 14). While Dr. Reams' opinion did find only "slight" limitation as to Blanchard's concentration/persistence/pace, she in fact found moderate to marked impairment of Blanchard's ability to relate to supervisors and coworkers, and moderate impairment of her ability to cope with routine work stress. Those findings do not support a finding of mild limitation as to social functioning. The only other available opinion is that of Dr. Edelman, which found no significant limitations at all. Thus, it is not clear whose opinion the ALJ relied upon to establish a mild limitation on social functioning.

This casts doubt on the ALJ's RFC assessment that Blanchard's work must involve no interaction with the public and occasional interaction with coworkers. (Tr. 14). While those restrictions might appear to coincide with moderate limitations at first blush (despite the ALJ's finding of only mild limitations), Dr. Rattan's RFC assessment specifically found no significant limitation in Blanchard's ability to interact appropriately with the general public, while she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and moderately limited in her ability to get along with coworkers or peers. Though the ALJ supposedly discounted Dr. Rattan's findings, he did so by relying on Dr. Reams, whose opinion supports Dr. Rattan's assessment of social functioning. The ALJ did not provide any more particular analysis of how he arrived at the social function limitations in the RFC assessment. He did not explain how he translated

mild limitations on social functioning, as a broad category, into a lack of contact with the public and occasional contact with coworkers. As just noted, those conclusions conflict with the medical evidence. Ultimately, the state of the ALJ's opinion again shows a lack of reasoning connecting the evidence with the conclusions contained in the RFC. Thus, upon remand the ALJ should also seek to provide sufficient reasoning related to Blanchard's mental impairments in assessing her RFC.

In total, the ALJ made a number of errors in his RFC assessment, each worthy of remand. The ALJ failed to properly articulate reasons for his conclusion that Blanchard could sit for at least six hours during a workday, failed to address Blanchard's ability to use her right hand and arm, failed to discuss her alleged need to use a cane, and did not properly articulate how Blanchard's mental impairments factored into his ultimate RFC finding. Further, while the at-will sit/stand option was adequate, the ALJ may need to reconsider the amount of time spent off-task after adequately determining the weight to give Dr. Sethi's opinion.

## III. CREDIBILITY DETERMINATION

Next, Blanchard argues that the ALJ's credibility determination with regard to her testimony was patently wrong. The court agrees, finding the ALJ's credibility determination also requires remand. A court owes deference to an ALJ's credibility determination unless it is "patently wrong." *Getch*, 539 F.3d at 483. Thus, such a finding may be disturbed only if "unreasonable or unsupported." *Id.*

The ALJ found Blanchard's statements not credible "to the extent they are inconsistent with the . . . [RFC] assessment." (Tr. 15). To support this finding, the ALJ wrote:

> The medical records document the claimant's treatment for her impairments, as discussed above. She was seen from [time] to time, but not on a consistent basis for any condition. MRI evaluation showed some degenerative joint disease in her back and knees. She received some counseling to address her mental condition, but this was terminated because she did not attend or call to schedule appointments as advised. The claimant testified she did not continue with this treatment because she did not like being around other people and simply stopped going. The evidence shows the claimant tends to exaggerate her symptoms. The claimant alleged many more problems than the objective evidence substantiates, including hearing deficits. The claimant also reported having problems with concentration, yet her W-2 caseworker noted few mental problems, and actually described her as being competent, attentive and cooperative. At the hearing, the claimant testified she was barely able to do household chores and had problems using the bathroom. The claimant testified her back hurt such that she could not lift a gallon of milk and had to sit down while cooking. The claimant stated her 2 youngest children continued to live with her and she did not do anything outside of the home. However, the medical records document the claimant reporting daily activities such as cooking, cleaning, laundry, watching television and using a computer. Such activities are not consistent with the vision and hearing problems, the claimant alleged.

(Tr. 15). There are a number of problems with this credibility determination. First, the fact that the ALJ stated simply that he found Blanchard's testimony not credible only to the extent it conflicted with his RFC assessment is not helpful in determining what statements he actually found lacking in credibility. While this alone is probably not error worthy of remand, it colors the rest of his credibility finding.

Second, the ALJ points to supposed inconsistency in treatment as a reason for lack of credibility. However, an ALJ may not draw inferences regarding

symptoms and functional effects "from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. While the court is skeptical in the first instance what bearing twice-yearly visits to a doctor for roughly five years has on credibility when being treated primarily through pain management medication (Tr. 175-213, 303, 312, 317), the fact is that the ALJ did not even discuss the conservative character of treatment or Blanchard's other statements as to her willingness to venture out into public. There is no adequate reasoning here.

Third, the ALJ found that Blanchard exaggerated symptoms, another finding for which he offers inadequate reasoning. He attempts to support this finding by claiming that Blanchard alleges more problems than can be substantiated by the objective evidence, "including hearing deficits." There is no evidence in the record to show that Blanchard ever complained of hearing deficits. Where the ALJ conjured this from is beyond the court, and it is particularly telling that the Commissioner's brief does not even address this point, though Blanchard's briefing brings it up. This in itself makes the ALJ's charge of exaggeration suspect when he appears to be unfamiliar with the record itself. But aside from that, the rest of his reasoning is weak. He points to the professional contact questionnaire filled out by Blanchard's W-2 caseworker that supposedly establishes "few mental problems." Not only was that questionnaire not the result of a formal mental examination, the record does not indicate that Mr. Bagley is even a doctor. Non-medical evidence surely may be

considered, but the ALJ does not even discuss the host of other medical evidence which would substantiate concentration problems. In fact, the ALJ himself concluded in his RFC assessment that Blanchard had mild limitations regarding concentration. The court fails to see how this establishes in any way that Blanchard exaggerates symptoms or is otherwise not credible.

The ALJ also takes issue with the fact that Blanchard testified she could barely do household chores, but that her reported daily living activities included such chores. The ALJ completely ignores the fact that Blanchard repeatedly indicated that she accomplishes such chores with the aid of her children and that, for example, in the case of cooking she reported she must remain seated while doing so and it can take her three to five hours to complete. (Tr. 137-38). How any of this is inconsistent enough to support a finding that Blanchard exaggerates her symptoms is beyond the court. The ALJ further offers the fact that cooking, cleaning, laundry, television, and computer-use are inconsistent with Blanchard's alleged vision and hearing problems. Again, there is nothing in the record to suggest Blanchard ever alleged hearing deficits. And in any event, conducting such activities is in no way inconsistent with vision or hearing problems, nor does the ALJ explain how such activities are inconsistent with such problems. It appears almost as if the only way the ALJ would accept Blanchard's allegations is if she laid dormant in her bed every day because she had trouble seeing or hearing. That is preposterous, and, without any sufficient reasoning evident in the ALJ's allegation of exaggerations, the court cannot uphold the credibility finding.

The Commissioner argues that the ALJ may have based his credibility finding on the fact that Blanchard failed to report income to W-2 at one point, but the ALJ never so much as mentions this in his credibility determination. Nor, without deciding, does it appear from the record that the circumstances of her problem indicate any willingness to exaggerate or otherwise non-credibly testify as to her symptoms and functional limitations. As such, the court finds the ALJ's credibility determination both unreasonable and unsupported, requiring remand.

## IV. STEP FIVE OF THE SEQUENTIAL EVALUATION

Finally, Blanchard asserts that the ALJ failed to meet his burden at step five of the sequential evaluation process because the hypotheticals presented to the VE failed to include limitations related to the use of a cane, and were based on a faulty RFC that improperly rejected Dr. Sethi's physical assessments. Blanchard is correct that, because the RFC assessment was faulty, the hypotheticals provided to the VE were similarly faulty. Because those hypotheticals were faulty, the VE's opinion cannot sufficiently support his opinion as to work Blanchard is capable of performing.

Accordingly,

**IT IS ORDERED** that the defendant's Motion for Leave to File Excess Pages (Docket #19) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the decision of the Commissioner denying the plaintiff's application for Disability Insurance benefits and Supplemental Security Income benefits be and the same is hereby **VACATED** and the plaintiff's application for benefits is **REMANDED** for further proceedings consistent with this opinion.

The clerk is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 7th day of March, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge